UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES | ) |
| | ) Docket No. 2019-CR-175-NT |
| v. | ) |
| | ) |
| ALEXIS BOYD | ) |
| | ) |

**BRIEF OF AMICUS CURIAE THE
AMERICAN CIVIL LIBERTIES UNION OF MAINE FOUNDATION**

The American Civil Liberties Union of Maine Foundation ("ACLU of Maine") submits this amicus curiae brief in support of Defendant Alexis Boyd, to assist the Court in resolving the issues in the case.

The ACLU of Maine is a nonprofit, nonpartisan organization founded in 1968 to protect and advance the civil rights and civil liberties of all Mainers. The ACLU of Maine strives to ensure the protection of the rights guaranteed and secured by the Maine and United States Constitutions, including the right to equal protection of the laws and protection against race-based discrimination.

**I.      INTRODUCTION**

The Maine State Police admit that "[t]he act of racial profiling by law enforcement is illegal,"[1] but their actions are not always consistent with their words. The facts presented in Ms. Boyd's motions suggest that the Maine State Police routinely violate the Fourth and Fourteenth Amendment rights of Black drivers on Maine's highways. As discussed below, this brand of racial profiling is commonplace in our

---

[1] *Maine State Trooper Faces Racial Profiling Allegations*, ASSOCIATED PRESS (Oct. 8, 2020).

1

country and, as a result, distrust in our criminal justice system has reached an all-time high. There are plenty of places to assign blame for this crisis of confidence, but the reality is that the blame cannot stop with the police. The practice of racial profiling will only end if everyone involved in the criminal legal system—police, prosecutors, defense attorneys, jurors, judges, and amici curiae—stops excusing and allowing it. This must happen one case at a time and so, to confirm that racial profiling is illegal in theory *and* in practice, the Court should grant the requested relief, suppress evidence from the stop, and allow Ms. Boyd's request for discovery.

## II. The problem of racial profiling by law enforcement.

Racial profiling by police—including at traffic stops—is all too common. Black people in America are more likely to be pulled over by police while driving than white people. *See, e.g.*, Radley Balko, *There's overwhelming evidence that the criminal justice system is racist. Here's the proof,* The Washington Post (June 10, 2020) (citing numerous studies).[2] They are more likely to be stopped when not driving. After they are stopped, Black people are more likely to be searched,[3] and are more likely to be ticketed

---

[2] One study, for example, considered 95 million traffic stops by 56 police agencies and "found evidence that the bar for searching black and Hispanic drivers was lower than that for searching white drivers." Pierson, et al., A large-scale analysis of racial disparities in police stops across the United States, Nature Human Behavior 4, 736-746 (2020), available at https://www.nature.com/articles/s41562-020-0858-1. These results "indicate[d] that police stops and search decisions suffer from persistent racial bias and point to the value of policy interventions to mitigate these disparities." *Id.* Another reported that Black motorists were 30 percent more likely to be pulled over than white motorists in Cincinnati. Editorial Board, *Racial disparities in police stops demand attention*, The Enquirer (Dec. 20, 2019), available at https://www.cincinnati.com/story/opinion/2019/12/20/editorial-racial-disparities-police-stops-demands-attention/2666685001/. Another reported that Black people in California were stopped at a rate 2.5 times higher than the per capita rate of whites. Don Thompson, Report: California Cops More Likely to Stop Black Drivers, U.S. News (Jan. 2, 2020), available at https://www.usnews.com/news/best-states/california/articles/2020-01-02/report-california-cops-more-likely-to-stop-black-drivers.

[3] A 2019 report from Vermont, for example, found that Black drivers were six times more likely than white drivers to be searched by police after a traffic stop. Balko, *supra* n.1, (citing Aidan

2

and arrested. *Id*. Statistics around drug-related arrests are particularly striking. Black and white Americans sell and use drugs at similar rates, but Black Americans are 2.7 times as likely to be arrested for drug-related offenses.[4] Sadly, and notoriously, race-based policing extends beyond stops, searches and arrests. *Id*. Black people are far more likely to be killed by police in America. *Id*.[5] Of the 1,127 people killed by police in this country last year, 28 percent were Black, even though only 13 percent of the population is Black.[6]

It is not surprising that widespread discriminatory policing has led to an overwhelming lack of confidence in law enforcement and our criminal justice system, especially among Black Americans. A Gallup poll last year found that only 19 percent of Black respondents had a great deal of confidence in police, compared to 56 percent of white respondents. *See* Jeffrey M. Jones, *Black, White Adults' Confidence Diverges Most on Police*, GALLUP (Aug. 12, 2020). And cumulatively, "[f]or the first time in its 27

---

Quigley, *Racial disparities, search rates decline in Burlington police traffic stops*, VT Digger, (July 20, 2019), available at https://vtdigger.org/2019/07/30/racial-disparities-search-rates-decline-in-burlington-police-traffic-stops/. And another from North Carolina found that Blacks and Latinos were more likely to be searched than whites, even though searches of white motorists were more likely to turn up contraband *Id* (citing Camelia Simoiu, *et al.*, *The Problem of Infra-marginality in Outcome Tests for Discrimination* (June 20, 2017), available at https://arxiv.org/pdf/1607.05376.pdf).

[4] *Rates of drug use and sales, by race; rates of drug related criminal justice measure, by race*. The Hamilton Project (Oct. 21, 2016), available at https://www.hamiltonproject.org/charts/rates_of_drug_use_and_sales_by_race_rates_of_drug_related_criminal_justice.

[5] Statistics on racial profiling by police in Maine are unavailable because "Maine law enforcement agencies lack the data needed to address racial disparities" in our state. Matt Byrne, *Maine Law Enforcement Agencies Lack the Data Needed to Address Racial Disparities*, PORTLAND PRESS HERALD (June 19, 2020). Unfortunately, there is no reason to think that the trends in Maine are any different than those nationally.

[6] *See* MAPPING POLICE VIOLENCE, https://mappingpoliceviolence.org (last accessed January 19, 2021); Fatal Force: 980 people have been shot and killed by police in the past year, WASHINGTON POST (Jan. 18, 2021) (227 Black people were shot and killed by police in 2020 alone).

years of measuring attitudes toward the police, Gallup found that a majority of American adults do not trust law enforcement." Aimee Ortiz, *Confidence in Police Is at Record Low, Gallup Survey Finds,* THE NEW YORK TIMES (Aug. 12, 2020).

Beyond the statistics, this crisis of confidence affects how people interact with police on a local level. In one opinion detailing and condemning the history of racist police practices in America, federal Judge Carlton Reeves of the Southern District of Mississippi notes that "Black male teens …report a fear of police and a serious concern for their personal safety and mortality in the presence of police officers." *See Jamison v. McLendon*, 2020 WL 4497723, at *22 (S.D. Miss. Aug. 4, 2020) (internal citations omitted). Chief Judge Gregory of the Fourth Circuit Court of Appeals has likewise explained that "aggressive" and "discriminatory" police tactics are counterproductive because "arrests and successful prosecutions are unlikely without cooperating witnesses." *United States v. Curry*, 965 F.3d 313, 333 (4th Cir. 2020) (Gregory, C.J., concurring) (internal citations omitted). Such "alienation cannot be good for the police, the community, or its leaders. Fostering trust and confidence between the police and the community would be an improvement for everyone." *Floyd v. City of New York*, 959 F. Supp. 2d 540, 557 (S.D.N.Y. 2013).[7]

Lastly, and perhaps most importantly, discriminatory policing has a very human toll. Even when unjustified stops and searches do not result in an arrest, injury or death, and even though "any one stop is a limited intrusion in duration and deprivation of

---

[7] These concerns are relevant to the legal issues in this case. Under the Fourth Amendment, for example, "the degree of community resentment aroused by particular practices is clearly relevant to an assessment of the quality of the intrusion upon reasonable expectations of personal security." *Floyd,* 959 F. Supp. 2d at 557 (quoting *Terry v. Ohio*, 392 U.S. 1, 14 n.11 (1968)).

liberty, each stop is also a demeaning and humiliating experience." *Id*. The overarching principal must be that no person should be demeaned, humiliated, hurt or killed on the basis of their race, and especially not by police.

### III. Racial profiling is unconstitutional

Not only does racial profiling reduce faith in our criminal justice system, it is also unconstitutional. "Selective enforcement of motor vehicle laws on the basis of race is a violation of the Equal Protection Clause of the Fourteenth Amendment." *Flowers v. Fiore*, 359 F.3d 24, 34 (1st Cir. 2004) (citing *Chavez v. Ill. State Police*, 251 F.3d 612, 635 (7th Cir.2001); *see also Whren v. United States*, 517 U.S. 806, 813 (1996)). It is "exceedingly clear" that under the Fourteenth Amendment "police may not target drivers for traffic stops, citations, and further investigation because of their race." *Commonwealth v. Long*, 485 Mass. 711 (2020); *see also Floyd*, 959 F. Supp. 2d at 570 (New York City's stop and frisk practices unconstitutional because the Fourteenth Amendment "prohibits intentional discrimination on the basis of race") (citation omitted). The Ninth Circuit has explained that race is not an "appropriate factor" for police to consider because:

> police stops based on race or ethnic appearance send the underlying message to all our citizens that those who are not white are judged by the color of their skin alone. Such stops also send a clear message that those who are not white enjoy a lesser degree of constitutional protection—that they are in effect assumed to be potential criminals first and individuals second.

*United States v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000). Because the practice violates fundamental rights of its victims, courts have an obligation, at a

minimum, to "take[ ] seriously an allegation of racial profiling." *See Floyd*, 959 F. Supp. 2d at 660 (*quoting* United *States v. Davis*, 11 F. App'x 16, 18 (2d Cir. 2001)).

In addition to violating the constitutional right to equal protection, the practice of racial profiling[8] often leads, as it did here, to stops and searches that violate the Fourth Amendment. In a recent notable decision reprimanding the City of New York for its stop-and-frisk practices, the U.S. District Court for the Southern District of New York acknowledged that police stops based on race violate the Fourth and Fourteenth Amendment requirements that, respectively, "all stops be based on 'reasonable suspicion' as defined by the Supreme Court of the United States," and "second, that stops be conducted in a racially neutral manner." *Floyd*, 959 F. Supp. 2d at 556. A similar challenge concerning the City of Milwaukee's stop-and-frisk program resulted in a consent decree mandating, as the Constitution requires, that all stops to be based on reasonable suspicion and prohibiting officers "from relying to any degree on an individual's race" or other protected characteristics. *See* Order and Settlement Agreement at 6-7, *Collins v. City of Milwaukee*, Docket No. 17-cv-234-JPS, ECF No. 135 (July 23, 2018).

The U.S. Department of Justice (DOJ) has also, in cases that are not this one, called out police departments for racial profiling.  The DOJ has used its powers under

---

[8] In one consent decree, the U.S. Department of Justice Special Litigation Division defined "racial profiling" as follows:
> [T]he consideration by an officer, in any fashion or to any degree, of the race or ethnicity of any civilian in deciding whether to surveil, stop, detain, interrogate, request consent to search, or search any civilian; except when officers are seeking to detain, apprehend or otherwise be on the lookout for a specific suspect sought in connection with a specific crime who has been identified or described, in part, by race or ethnicity and the officer relies, in part, on race or ethnicity in determining whether reasonable suspicion exists that a given individual is the person being sought.

Consent Decree, *Ledford v. City of Highland Park*, No. 00-c-4212 (N.D. Ill. Aug. 6, 2015).

42 U.S.C. § 14141 (concerning unlawful conduct of law enforcement agencies), for example, to investigate the New Orleans Police Department, finding "a pattern or practice of," *inter alia*, "unlawful stops, searches, and arrests" and "discrimination on the basis of race."[9] The Department has likewise sued (along with a number of individual plaintiffs) Maricopa County, Arizona for widespread racial profiling, resulting in an injunction to stop the unconstitutional police practice and an order creating a victim compensation fund. *See Melendres v. Maricopa Cty.*, 897 F.3d 1217 (9th Cir. 2018). While the DOJ's efforts to combat racial profiling are helpful, too many individual victims of race-based policing are on the wrong end of DOJ's proverbial spear, required to navigate a criminal justice system that has not historically protected victims of racial profiling.[10] Alexis Boyd is one such victim which is why her motions should be granted.

### IV. Ms. Boyd's motions should be granted because Trooper Darcy stopped her because she is Black, as he has many drivers.

When evaluating Trooper Darcy's decision to stop Ms. Boyd, there are a few key details in the record that are worth repeating. The Trooper initially said that he stopped Ms. Boyd's car because it had crossed the fog line "two, almost three times." (Mot. for

---

[9] The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present at 45 (Jan. 2007) available at https://www.justice.gov/crt/file/922421/download. *See also id.* (stating that "[i]n Ferguson, Missouri, for example, the Division revealed that African-Americans were 26% less likely to be found with contraband after a search, even though that group was twice as likely as others to be searched during a traffic stop" and that DOJ "conducted similar analyses in Baltimore and other cases").

[10] As the Black Lives Matter movement heightens our national awareness of racial injustice, courts seem to be rethinking stale doctrines like qualified immunity. *See* Anya Bidwell & Patrick Jaicomo, *Lower courts take notice: the Supreme Court is rethinking qualified immunity*, USA TODAY (Mar. 2, 2021); *see also Stamps v. Town of Framingham*, 813 F.3d 27 (1st Cir. 2016) (no sovereign immunity because Fourth Amendment protects against reckless, though accidental, police killing). This is a welcome trend, but one that needs to accelerate if the American legal system is to overtake the seemingly-intractable problem of unconstitutional police practices.

Disc. Ex. 2.) Later, he apparently felt more comfortable with the number "three," writing in his report that the car crossed the fog line three times before the stop. (Mot. for Disc. Ex. 1.) But, according to Ms. Boyd's filings, the dashcam footage confirms that the car did not cross the fog line two or three times – the only time the car crossed the fog line was when Trooper Darcy's flashing lights commanded the car to pull over to the shoulder of the highway. (Mot. for Disc. Ex. 2.) The only other justification the Trooper gave for the stop was that the vehicle was traveling "like 45 miles per hour" in a 45-65 mile per hour zone (*id.*), but this did not make it into his report. (Mot. for Disc. Ex. 1.)

When considering the totality of the circumstances, including Trooper Darcy's credibility, it is also important to consider that Mr. Green, the driver, is a Black man who wears his hair in dreadlocks. Trooper Darcy has previously stated about another Black man that "[h]e looks like a thug" because "he's wearing a wifebeater, he's got dreads." (Mot. for Disc. at 10) (providing transcript of Trooper Darcy's comments in relation to a different traffic stop, *United States v. Walker*, 2:19-cr-00220-JDL.).[11] In the same recording, Trooper Darcy also stated "I'm interested in thugs" and "[t]hat's not racial profiling." Trooper Darcy undoubtedly thought he was being "proactive", consistent with the training of his Proactive Criminal Enforcement Team, when he stopped Ms. Boyd and Ms. Walker.  As discussed below, however, the facts leading to Ms. Boyd's arrest did not create "reasonable suspicion" of criminal activity and, instead,

---

[11]Trooper Darcy is apparently capable of identifying the race and hairstyle of drivers at night, given that his prior diatribe about "thugs" and dreadlocks occurred at approximately 9 PM in a pursuit and traffic stop of a driver meeting that description. *See* Megan Gray, *State lawmaker files complaint about award for trooper accused of racial profiling*, PORTLAND PRESS HERALD (Feb. 11, 2021), available at https://www.pressherald.com/2021/02/11/state-legislator-files-complaint-against-trooper-accused-of-racial-profiling/ (embedding the dashcam video with Trooper Darcy's comments).

raise a real concern that Trooper Darcy stopped Mr. Walker and Ms. Boyd for the simple and unconstitutional reason that they are Black.

### A. The Court should grant Ms. Boyd's motion to suppress.

It is important to enforce the law prohibiting racial profiling by granting Ms. Boyd's motion to suppress. Considering the totality of the circumstances, the government cannot meet its burden of showing that Trooper Boyd's stop and search of Ms. Boyd's vehicle was "supported by reasonable suspicion that criminal activity may be afoot." *United States v. Monteiro*, 447 F.3d 39, 43 (1st Cir. 2006). Given the past discriminatory practices of Trooper Boyd and his Proactive Criminal Enforcement Team, coupled with the lack of credible articulable suspicion before the stop, the Court should suppress any evidence obtained by the Maine State Police, which will serve to reinforce the First Circuit's admonition that racial profiling by law enforcement is unconstitutional.

In her motion to suppress, Ms. Boyd explains that the Court must look at the "totality of the circumstances" using a "commonsense, case-by-case" analysis to decide whether Trooper Darcy had reasonable suspicion to stop her car. (Mot. to Suppress at 5, *citing United States v.* McGregor, 650 F.3d 813, 821 (1st Cir. 2011).) This strand of Fourth Amendment law requires an objective analysis, viewing the totality of the circumstances "through the lens of a reasonable police officer." *United States v. Dapolito*, 713 F.3d 141, 148 (1st Cir. 2013). But there is a second strand to the reasonable-suspicion standard, one that requires "that weight must be given to the police officers' training and experience." *United States v. Ramos*, 629 F.3d 60, 65-66 (1st Cir. 2010). *See also United States v. Wright*, 582 F.3d 199, 207 (1st Cir. 2009) ("We

9

agree that the proper focus is an objective one, but we disagree that the inferences made by police officers area irrelevant in all instances").

Both strands of the reasonable-suspicion standard are fact-specific and "less circumscribed by precedent than otherwise" because the Supreme Court intends it to be useful for "guiding officers in the field." *United States v. Arvizu*, 534 U.S. 266, 275-6 (2002). Put differently, in evaluating whether Trooper Darcy's suspicions were reasonable given the facts of this case, one of the Court's mandates is to "provid[e] law enforcement officers with a defined set of rules" for conducting traffic stops and searches. *Ornelas v. United States*, 517 U.S. 690, 697 (1996).

Because the Court's analysis will be used to "guid[e] officers in the field" (*Arvizu*, 534 U.S. at 275), the Court cannot (and need not) ignore Trooper Darcy's history of racist policing. The troubling rhetoric ("*It's not a hunch if your discoveries are based on Training and Experience"*) and behavior of his Proactive Criminal Enforcement Team is likewise material to the Court's totality-of-the-circumstances analysis. *See* Boyd Mot. for Disc. at 11-14 & Exh. 4. Whatever "set of rules" is currently guiding Trooper Darcy and his brethren in the Maine State Police, it is obviously incomplete, missing the fundamental requirement that police may not stop a motorist because she looks like a "thug" (Mot. for Disc. at 10) or because she is Black. *See e.g. Montero Camargo*, 208 F.3d at 1134 n. 22 ("persons of a particular racial or ethnic group may not be stopped and questioned because of [their] appearance, unless there are other individualized or particularized factors which, together with the racial or ethnic appearance identified, rise to the level of reasonable suspicion"). It is the Court's job to fix this omission and "guide the officers in the field" (*Arvizu*, 534 U.S. at 275) – i.e. the Maine State Police – away from racist policing practices that are both unconstitutional and ineffective.

10

Although the Court has been instructed that the "actual motivations" of Trooper Darcy are irrelevant when evaluating the reasonableness of his decision to stop Ms. Boyd (*Whren v. United States*, 517 U.S. 806, 813 (1996)), *Whren* does not preclude the Court from considering the Trooper's training and experience, including his training in so-called "proactive enforcement" and his considerable experience stopping Black motorists. *Ramos*, 629 F.3d at 65. Moreover, the First Circuit has acknowledged that "the inferences made by police officers are" relevant to Fourth Amendment analysis, *Wright*, 582 F.3d at 207, and the Court should not ignore Trooper Darcy's inference that a Black man with dreadlocks is, in his words, a "thug", especially because Mr. Green is a Black man with dreadlocks.[12] In deciding whether Trooper Darcy's suspicions were reasonable and the stop justified, "weight must be given" to Trooper Darcy's training, experience and well-documented racist inferences (*Ramos*, 629 F.3d at 65), weight that, in this case, tips the scales toward the conclusion that Trooper Darcy's stop of Ms. Boyd was unconstitutional and unsupported by reasonable suspicion, and that the fruits of that stop should be suppressed.

---

[12] Though courts have traditionally treated an officer's experience, training and heat-of-the-moment inferences as factors supporting the lawfulness of a stop, there is no reason these factors cannot also lead to a decision that the officer's suspicions in a particular case were unreasonable. Courts will consider an officer's inferences, after all, because they presume that the officer's training and experience allow him to reach conclusions based on discrete information that an ordinary person would not reach. *See Ornelas*, 517 U.S. at 699. But if, rather than leading an officer to suspect that a loose panel in a car contains contraband, for example (*id.*), this training and experience instead leads an officer to suspect someone is engaged in criminal activity because of their race, this is equally material to the reasonableness of the officer's suspicions.

The Court's decision on the pending motions will have an impact beyond Ms. Boyd's case; it will also serve to remind officers operating in the District of Maine that racist policing is unconstitutional and that honesty is paramount to the public's trust in the police. Ms. Boyd correctly points out that one of Trooper Darcy's stated reasons for stopping her vehicle, that it crossed the fog line multiple times, is contradicted by his dash cam footage. (Mot. to Suppress at 5-6.) Amicus believes this discrepancy is attributable to Trooper Darcy's training in "proactive enforcement" and his history of using this training on Maine's highways. When he saw a vehicle driven by a Black man, with a Black woman (Ms. Boyd) in the passenger seat, Trooper Darcy had a "hunch" and, if his P.A.C.E training taught him anything, it was that he wasn't going to "let them go because [he] didn't think [he] had enough to stop them for." (Mot. for Discovery Ex. 4.) Instead, as he learned from P.A.C.E., he wrote his report "with proper, descriptive phraseology," even if the description and the "phraseology" were not actually true. (Mot. for Discovery Ex. 4.) This type of *post hoc* justification for a racist traffic stop is not unique to Trooper Darcy, which is likely one reason that public confidence in police is at an all-time low. *See supra* at 3-4.

To determine whether Trooper Darcy's suspicions of Ms. Boyd were reasonable and his *post hoc* justifications truthful, the Court must evaluate his credibility. *Ornelas v. United States*, 517 U.S. 690, 700 (1996) (part of Fourth Amendment analysis includes determining whether the officer is credible). Trooper Darcy's previous statements on race and his pattern of stopping Black drivers are necessarily part of this evaluation. *See* Fed. R. Evid. 607 & 608. By emphasizing the need for officers to be truthful and by explicitly recognizing the racist bent to Trooper Darcy's training, experience and inferences, the Court can rewrite the rulebook that is currently in circulation, at least

among the Maine State Police Pro-Active Enforcement Team. The Court should grant Ms. Boyd's motion to suppress and give notice that the commonplace practices of Trooper Darcy violate the Fourth Amendment.

### B. The Court should grant Ms. Boyd's motion for discovery

The discovery requested by Ms. Boyd is necessary and appropriate given the recent pattern of race-based policing by Trooper Darcy and his Proactive Criminal Enforcement Team. Ms. Boyd urges the Court to conclude that the standard for discovery in selective prosecution claims, as established by *Armstrong v. United States*, 517 U.S. 456 (1992), should not apply to claims of selective enforcement by police officers. (Mot. for Disc. at 21-22.) As discussed below, there are good legal and policy reasons for the Court to reach this conclusion. But even if the First Circuit did eventually decide that *Armstrong* applies, the factual showing in this case is strong enough to meet that heightened standard anyway.

As an initial matter, the Court should follow the lead of the Third, Fourth, Seventh, and Ninth Circuits (and the Southern District of New York) and apply a lower standard for discovery in selective enforcement claims, as opposed to the heightened *Armstrong* standard applied in selective prosecution cases. (Mot. for Disc. at 19-20 & nn.8-13.) The standard for discovery established by *Armstrong v. United States* is famously self-defeating, requiring a defendant to make a "credible showing of different treatment of similarly situated persons" and present "some evidence" of the prosecutors' discriminatory intent. *Id*. 517 U.S. at 468 & 470. This test has been described as an "insuperable discovery standard" that "creates an abstract right without a remedy." Alison Siegler & William Admussen, *Discovering Racial Discrimination by the Police,* Northwestern Law Review 115:1 (2021) at 5. "*Armstrong's* cruel catch-22" is that a

13

defendant "must provide evidence of discrimination to obtain discovery about discrimination." *Id.* at 6. Yet, as Ms. Boyd explains, *Armstrong* addresses claims of selective prosecution; it is far from clear that the standard should also apply to claims of racial discrimination by law enforcement, especially in the First Circuit where the question remains undecided. (Mot. for Disc. at 15 - 22.)

There is good reason to decide that *Armstrong* should not apply to claims of selective law enforcement. Prosecutors and police are fundamentally different. The unique immunity and work product protections that must be overcome in selective prosecution claims do not apply to law enforcement. The Seventh Circuit has explained that *Armstrong* reflects "a strong presumption of honest and constitutional behavior" on the part of federal prosecutors, a presumption that does not extend to law enforcement because "[u]nlike prosecutors, agents regularly testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel." *United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015). Agreeing with the Seventh Circuit, and noting that police officers "are expected to testify in criminal cases, with their honesty and candor open to challenge", the Third Circuit has also adopted a lower discovery standard for claims of selective law enforcement, requiring only "some evidence of discriminatory effect." *United States v. Washington*, 869 F.3d 193 (3d Cir. 2017).

Most recently, the Ninth Circuit has joined the fray, emphasizing that the reasoning of *Armstrong* does not apply to police because, unlike prosecutors, their "investigatory decisions are regularly questioned at trial, and their credibility is put before courts and juries." *United States v. Sellers*, 906 F.3d 848, 853 (9th Cir. 2018). The Ninth Circuit declined to adopt a specific standard for discovery of claims involving racial discrimination by police, instead deciding that "a defendant must have *something*

14

more than mere speculation to be entitled to discovery" but "what that *something* looks like will vary from case to case. The district court should use its discretion—as it does for all discovery matters—to allow limited or broad discovery based on the reliability and strength of the defendant's showing." *Id*. at 855 (emphasis in original).[13]  Treating police officers differently than prosecutors makes sense because, aside from the fact that officers' credibility is routinely at issue in criminal cases, "[p]rosecutors are ordinarily shielded by absolute immunity for their prosecutorial acts, but police officers and federal agents enjoy no such categorical protection." *Washington*, 869 F.3d at 219. It does not make sense to protect police officers from discovery to the same degree as prosecutors.

The First Circuit has not addressed whether the "insuperable" *Armstrong* standard for discovery also applies to claims of racial discrimination by police and the Court should adopt the sound reasoning of Seventh, Third and Ninth Circuits. The credibility of Trooper Darcy, his intent, and the policies and practices of the Maine State Police are decidedly at issue in Ms. Boyd's motion to suppress and her motion to dismiss, as they are in several other pending criminal cases. (Boyd. Mot. for Disc. at 8 - 11.) The Court cannot fully and fairly evaluate Trooper Darcy's credibility or the

---

[13] These opinions from the Seventh, Third and Ninth Circuits all concerned challenges to so-called reverse sting or stash house operations by federal agents, in which undercover agents approach targets with an opportunity to rob a stash house containing a large quantity of drugs. There is no stash house to rob but when the targets meet up to carry out the plan (which the federal agents talked them into) they are arrested for conspiracy to commit robbery, among other crimes. *See Sellers*, 906 F.3d at 850 (describing stash house operations). These operations overwhelmingly, almost exclusively, target people of color. *See* Shayna Jacobs*, 10 years. 179 Arrests. No White Defendants. DEA Tactics Face Scrutiny in New York*. WASH. POST (Dec. 14, 2019). While Ms. Boyd's case is obviously not a stash house operation, these opinions are equally applicable to claims of racist or "proactive" police practices on the highway which also appear to disproportionately and intentionally target Black drivers.

15

lawfulness of his traffic stop without the discovery requested. Because there is no reason, in terms of precedent or policy, for the Court to protect Trooper Darcy or his record from reasonable scrutiny, discovery should be allowed.

Here, even if the Court applies *Armstrong*, it should permit discovery because Ms. Boyd can present evidence sufficient to show discriminatory effect and discriminatory intent. Under the first prong of the *Armstrong* test, the data provided by Ms. Boyd suggesting that Trooper Darcy's team stops Black drivers twice as often as white drivers (Mot. for Disc. at 14) is a "credible showing of different treatment of similarly situated persons" of another race. *Armstrong*, 517 U.S. at 470. Given that there are many more white drivers than Black drivers on Maine's highways, it is hard to imagine a more credible showing, without discovery, that Trooper Darcy and his colleagues treat white drivers differently.

Ms. Boyd has also satisfied the second prong of *Armstrong*, requiring "some evidence" of discriminatory intent on the part of Trooper Darcy. *See Armstrong*, 517 U.S. at 468. The Trooper's commentary on Terrel Walker ("he's wearing a wifebeater, he's got dreads. He looks like a thug…I'm not profiling him racially" (Mot. for Disc. at 10)) certainly provides "some evidence" that Trooper Darcy intentionally discriminates against Black people as part of his proactive policing strategy. *Id*. This evidence is even stronger because the driver in this case, Mr. Green, is a Black man with dreadlocks.

The evidence currently in Ms. Boyd's possession may not be dispositive in this case, but it shows that Trooper Boyd and his team routinely profile Black drivers and that the Trooper specifically profiles Black men with dreadlocks such as the driver of the car here. This must be enough to trigger discovery, the purpose of which is to gather the information solely in possession of the government that is needed to prove claims of

16

racial discrimination. If the Court concludes that the evidence presented by Ms. Boyd is insufficient to allow discovery, then the practical reality of *Armstrong* may be that claims of selective enforcement against police are impossible to pursue. Such a result would further erode public confidence in our criminal justice system by sending the harmful message that police can profile with impunity and victims are helpless to fight back.

## CONCLUSION

Ms. Boyd's motion to suppress and motion for discovery should be granted for the reasons explained above.

April 20, 2021

/s/ Matthew Warner
Matthew Warner
Maine Bar No. 4823
Preti Flaherty Beliveau & Pachios LLP
One City Center
P.O. Box 9546
Portland, ME 04112-9546
207.791.3000
mwarner@preti.com

/s/ Zachary L. Heiden
Zachary L. Heiden
/s/ Emma E. Bond
Emma E. Bond
American Civil Liberties Union of Maine Foundation
P.O. Box 7860
Portland, Maine 04112
(207) 619-6224
heiden@aclumaine.org
(207) 619-8687
ebond@aclumaine.org

*Attorneys for American Civil Liberties of Maine Foundation*

## CERTIFICATE OF SERVICE

  I hereby certify that on April 20, 2021, I electronically filed the Brief of Amicus Curiae with the Clerk of Court using the CM/ECF system, which will send notifications of such filings to all counsel of record.

             /s/ Matthew Warner
             Matthew Warner
             Preti Flaherty Beliveau & Pachios LLP
             *Attorney for American Civil Liberties of Maine Foundation*