**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No.  2:19-cr-00175-NT** |
| | ) | |
| **ALEXIS BOYD** | ) | |


### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR DISCOVERY

The United States of America, by and through its attorneys, Donald E. Clark, Acting United States Attorney for the District of Maine, and Meghan E. Connelly, Assistant United States Attorney, respectfully objects to defendant Alexis Boyd's Motion for Discovery (ECF 41). The defendant has been charged by indictment with one count of possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a)(1) (ECF 3). The defendant requests three years' worth of material pertaining to Maine State Police Trooper John Darcy ("Trooper Darcy") and the Maine State Police P.A.C.E. team.  For the following reasons, the government respectfully requests that the defendant's motion for discovery be denied.

## PROCEDURAL HISTORY

### A. Defendant's Discovery Request

On April 6, 2021, the defendant filed a discovery motion (ECF 41-43) pursuant to the government's *Brady*[1] obligation seeking three years of records pertaining to traffic stops made by Trooper Darcy.[2]  Specifically, the defendant seeks to obtain:

1. All police reports and videos for stops on the Maine Turnpike by Darcy for the past three years, including:

   a. The purported justification for the stop;

   b. All communications about the alleged justifications for the stops or detention, including text messages between Trooper Darcy and other Maine State Troopers relating to the stop;

   c. The race of the driver and any or all passengers in the vehicle;

   d. Names of the drivers and vehicle occupants;

   e. All records of citations and warnings actually issued pursuant to these stops, and all records of drivers released with no formal actions taken against them;

   f. All records regarding the frequency of K-9 investigations subsequent to such stops;

   g. All records related to the frequency with which Trooper Darcy search stopped vehicles via means other than K-9 sniffs;

   h. All records related to the purported justifications for the K-9 sniffs;

   i. All records related to the frequency with which Trooper Darcy actually discovers contraband in stopped vehicles;

   j. All records related to the frequency with which Trooper Darcy actually discovers contraband in stopped vehicles through K-9 sniffs;

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).
[2] The defendant simultaneous filed two other motions for relief, Defendant's Motion to Dismiss (ECF 43) and Defendant's Motion to Suppress (ECF 42).

2. Any complaints known, filed or reported against Trooper Darcy by the public, his peers, and colleagues, and prosecutors alleging that he conducted traffic stops not supported by articulable suspicion or engaged in racial profiling for the duration of his law enforcement career, and any disciplinary actions against him on this basis.

3. All complaints known, filed or reported against Trooper Darcy by the public or his peers and colleagues or prosecutors for using racial slurs, articulating racial prejudice, using or referencing racial stereotypes or other racist language or behavior.

4. All police reports and video and audio recordings for any vehicle stops on the Maine Turnpike conducted by all troopers of the Maine State Police Proactive Criminal Enforcement Team (P.A.C.E.) in the last three years, including:

    a. The purposed justification for the stop;

    b. All communications about the alleged justifications for the stops or detention, including text messages between Maine State Troopers relating to the stop;

    c. The race of the driver and any or all passengers in the vehicle;

    d. Names of drivers and vehicle occupants;

    e. All records of citations and warnings actually issued pursuant to these stops, and all records of drivers released with no formal action taken against them;

    f. All records regarding the frequency of K-9 investigations subsequent to such stops;

    g. All records related to the frequency with which troopers search stopped vehicles via means other than K-9 sniff. All records related to the frequency with which troopers actually discover contraband in stopped vehicles;

5. Any complaints known, filed or reported against troopers of the Proactive Criminal Enforcement Team (P.A.C.E.) of the Maine State Police by the public or their peers and colleagues or prosecutors alleging that they conducted traffic stops not supported by

articulable suspicion or engaged in racial profiling for the duration of their law

enforcement career, and any disciplinary actions taken against troopers on these bases.

6. Any complaints known, filed or reported against troopers or Proactive Criminal

Enforcement Team (P.A.C.E.) of the Maine State Police by the public or peers and

colleagues or prosecutors for using racial slurs, articulating racial prejudice, using or

referencing racial stereotypes or other racists language or behavior.

Defendant's discovery requests can be divided into two categories of materials. The first

category of requested materials concerns information regarding any complaints made against

Trooper Darcy alleging racial bias, the use of racial slurs, etc. (Items 2 and 3, as indicated

above).[3]  The second category includes information that defendant contends might demonstrate a

pattern of racial bias in police-initiated vehicle stops for violations of traffic laws (Items 1 (a-j)

and 4 (a-g), as indicated above).

### B.  Government's Response

Regarding the first category of materials identified above, the government is only aware

of the complaints mentioned in this motion.  However, the government is aware of its ongoing

obligations under *Brady* and *Giglio* and, will furnish any *Brady* and *Giglio* material at such a

time as to permit its appropriate use by the defense.

Regarding the second category of materials identified above, the government has already

responded to the defendant's discovery request by making certain documents and videos

available for defense counsel's review and inspection.  While providing these documents was not

required, as a sufficient showing was not made by the defendant in her motion to warrant turning

---

[3] Defendant also requests records regarding such complaints made against any other member of the P.A.C.E. team (Items 5 and 6). Such materials, even if they exist, are not discoverable in this matter under Rule 16, *Brady*, *Giglio*, and the Jencks Act.

over the discovery, the government nevertheless produced these documents as a discretionary

matter.  On July 15, 2021, defense counsel reviewed the following materials at the U.S.

Attorney's Office:

1.  A paper copy of a spreadsheet listing details of all of Trooper Darcy's 2020 drug seizures, including race, reason for the stop, result of the stop, prosecuting authority, how the search was conducted, the type of search, and whether drugs were located;

2.  A paper copy of a spreadsheet listing the details of the five traffic stops before and after each of Trooper Darcy's drug seizures that was sent to the State of Maine for proposed prosecution, including race, reason for the stop, result of the stop, prosecuting authority, whether a search was conducted and what kind, whether drugs were located, and the registration and license state;

3.  A paper copy of a spreadsheet listing the details of the five traffic stops before and after each of Trooper Darcy's drug seizures that was sent to the United States Attorney's Office for proposed prosecution, including race, reason for the stop, result of the stop, prosecuting authority, whether a search was conducted and what kind, whether drugs were located, and the registration and license state;

4.  A paper copy of a spreadsheet listing all traffic stops made by Trooper Darcy between January 2019 and October 2020, including date, location, license location, license plate registration location, and reason for the stop.

5.  A numerical breakdown by race (White, Black, Hispanic, Asian, and Unknown) in traffic stops made by Trooper Darcy between January 2019 and October 2020;

6.  Trooper Darcy's dash camera video from *United States v. Terrel Walker*, 19-220-JDL, a case charged in the District of Maine that was subsequently dismissed on government motion on September 23, 2020;

7.  The arrest report of Terrel Walker drafted by Trooper Darcy; and

8.  A redacted transcript of an audio recorded interview with Trooper Darcy made during a Maine State Police internal investigation into a complaint of racial profiling stemming from the stop in *United States v. Terrel Walker.*

Items numbers 1 through 5 and 8 were provided to the United States Attorney's Office

by the Maine State Police.  The Maine State Police Office of Professional Standards investigated

Trooper Darcy's conduct in *United States v. Terrel Walker*.  The investigation included

interviews and an examination of over one thousand traffic stops conducted by Trooper Darcy.

The United States Attorney's Office has obtained documents created by the Maine State Police during the course of its investigation and has provided some of these documents, with redactions, to the defendant. [4]  Nothing has been provided to the defendant in relation to her request for P.A.C.E. team discovery.

## ARGUMENT

### DISCOVERY ON A CLAIM OF SELECTIVE ENFORCEMENT ON THE BASIS OF RACE MAY NOT BE ORDERED ABSENT EVIDENCE THAT SIMILARLY SITUATED PERSONS OF A DIFFERENT RACE HAVE NOT BEEN STOPPED AND/OR ARRESTED

Selective enforcement of motor vehicle laws on the basis of race is a violation of the Equal Protection Clause of the Fourteenth Amendment. *See Chavez v. Illinois State Police*, 251 F.3d 612, 635 (7th Cir. 2001); *see also Whren v. United States*, 517 U.S. 806, 813 (1996); *Flowers v. Fiore*, 359 F.3d 24, 34-35 (1st Cir. 2004).  Defendant asserts that she is entitled to broad discovery into Trooper Darcy's work as a Maine State Trooper, as well as searching discovery into the work of the Maine State Police P.A.C.E. team, on the basis that such material is discoverable either under *Brady* or to support a claim of selective enforcement on the basis of race.  She specifically contends that records of Trooper Darcy's and other Troopers' stops would aid her in "showing a pattern of racial profiling and animus," which could be used to attack Trooper Darcy's credibility, as well as provide evidence for an Equal Protection claim against Trooper Darcy through selective enforcement.  The government already has provided material in

---

[4] Following its investigation, the Maine State Police concluded that there was "no evidence of any pattern of targeting of motorists based on race, or any other trait common to a protected group." *Investigative Findings Regarding MSP Trooper John Darcy*, Maine State Police (July 13, 2021), https://www.maine.gov/dps/msp/media-center/public-releases/investigative-findings-regarding-msp-trooper-john-darcy.

response to the defendant's request.  For the following reasons, this Court should deny the defendant's request for any additional materials.

### A.  The Requested Documentation Does Not Fall Under The Government's *Brady* Obligation

In claiming that the requested materials would be favorable and material to her, the defendant argues that they must be produced pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Though defendant contends that the requested materials should be produced under *Brady*, what she really seeks is evidence of selective enforcement. *See United States v. Feliciano*, 998 F. Supp. 166, 174 (D. Conn. 1998) (finding although the defendant framed a request for mitigating evidence under *Brady*, the request was really for evidence of selective prosecution and the defendant did not meet their initial burden of establishing entitlement to this information under *Armstrong*[5]). However, several courts have found that *Brady* does not compel the disclosure of information in connection with a defendant's claim of selective enforcement.  *See, e.g.*, cf. *United States v. Safavian*, 233 F.R.D. 12, 20 (D.D.C. 2005) (denying discovery of selective prosecution evidence unless it was independently discoverable under *Brady*); *United States v. Blumberg*, No. CRIM. 00-10-B-S, 2000 WL 1511194, at *5 (D. Me. Oct. 5, 2000) (holding that selective prosecution evidence is not material under *Brady*); cf. also *United States v. Armstrong*, 517 U.S. 456 (1996) (concluding that evidence of selective prosecution is not "material" under what is now Fed. R. Crim. P. 16(a)(1)(E))."

Defense counsel cites *United States v. Prochilo,* claiming that if the materials she requests are outside of the government's *Brady* obligation, then the defendant may request an *in camera* inspection of the disputed materials by the court. 629 F.3d 264, 268 (1st Cir. 2011).

---

[5] *United States v. Armstrong*, 517 U.S. 465 (1996)

7

*Prochilo* centers around a dispute over *Brady* materials for two certified informants. Selective enforcement was not a factor, as is the asserted issue in the instant motion. However, the court in *Prochilo,* determined in order to justify an *in camera* inspection by the court "the defendant must make some showing that the materials in question could contain favorable, material evidence." *Id.* (*citing Pennsylvania v. Ritchie*, 480 U.S. 39, 58 n.15 (1987) (explaining that the defendant must establish a "basis for his claim" that what he seeks "contains material evidence"). The court ruled that the showing cannot be merely speculative. *Id. at 268-269.* The defendant has only provided speculation as to what she believes this evidence will contain.

The defendant's claim that the discovery she seeks is material to her suppression motion to demonstrate Trooper Darcy lacked any reasonable articulable suspicion to stop the defendant's vehicle also fails. The stop, reasoning for, and subsequent interaction are all caught on Trooper Darcy's dash camera, which was provided to defense counsel shortly after her indictment. It is a long-standing principle "that the Constitution prohibits selective enforcement of the law based on considerations such as race." But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996).

The very issue defendant is asserting was just addressed by Judge Hornby in *United States v. Fagan*, 2:19-cr-123-DBH. "A motion to suppress…asserts that law enforcement violated the Fourth Amendment (not the Equal Protection Clause) in stopping the vehicle." *Id*. at p.3. Justice Hornby further articulated that the defendant was asking the prosecution to be barred from using evidence acquired from the stop as a result, even though it "might be highly probative of guilt." *Id*. He ruled that an assertion of a violation of an application of the law on the grounds

of discrimination is brought under the Equal Protection Clause and not the Fourth Amendment. *Id*. Presently, the defendant has the video that depicts the entire stop, showing the vehicle touching the fog line and being operated on the turnpike at about 45 miles per hour at night. Consequently, the discovery she seeks is not material to reasonable articulable suspicion for her suppression motion.

This Court accordingly should reject the defendant's claim for *Brady* discovery and/or *in camera* inspection of the requested materials.

### B. A Defendant Seeking Discovery On A Claim of Selective Enforcement Must Make A Substantial Threshold Showing

As explained, *infra*, selective enforcement discovery claims are subject to the standards articulated by the Supreme Court in *United States v. Armstrong*, 517 U.S. 465 (1996). In *Armstrong,* the Supreme Court explained that to obtain discovery in support of a claim of selective prosecution based upon race, the defendant must show that other races could have been prosecuted but were not. *Id.* at 469. Thus, the defendant must make a credible showing with some evidence of different treatment of similarly situated persons. *Id.* at 470. Here, the defendant cites eight cases that she contends demonstrate racial bias by Trooper Darcy: *United States v. Gregory Martin,* Docket 2:18-cr-00124; *United States v. Damon Fagan*, 2:19-cr-00123-DBH; *United States v. Thell Brown*, 2:19-cr-207-GZS; *United States v. Terrell Walker*, Docket 19-220-JDL; *United States v. Anthony Jones*, Docket 2:19-cr-201; *United States v. Judith Ruiz*, 2:19-mj-00364-JHR; *State of Maine v. Williams*, YRKCD -CR-2018-713; and *State of Maine v. Damion Dunkley*, YRKCD-CR-2019-508;. These cases do not suffice to meet the standard in *Armstrong* and, as a result, the defendant's motion should be denied.

Although the First Circuit has not addressed the matter of selective enforcement as it pertains to discovery, other Circuits have. Both the Tenth and Seventh Circuits have applied the standards articulated by the Supreme Court in *Armstrong* to selective enforcement claims.

In *United States v. Alcaraz-Arellano,* 441 F.3d 1252 (10th Cir. 2006), which stemmed from a traffic stop, the defendant filed a motion to dismiss and for discovery based on a claim of selective enforcement, arguing that the officer's decision to stop him was based, at least in part, on his race. *Id.* at 1261. Alcaraz-Arellano further requested, just as the defendant has here, information on various policies from the law enforcement agency, as well as personnel files from the officer including any records regarding racial-profiling complaints against him, records of the officer's vehicle stops for three years, and materials relating to the officer's drug-interdiction training. *Id.*

The Tenth Circuit applied the *Armstrong* standard and noted that in a selective prosecution case, two elements must be met: (1) the federal prosecutorial policy had a discriminatory effect, and (2) it was motivated by a discriminatory purpose. *Id*. at 1263 (*citing Armstrong*, 517 U.S. at 465). The court determined that similar standards should apply to selective enforcement claims and ruled "the standard for proving a selective-enforcement claim should be, as with selective prosecution claims, a demanding one." *Id.*

The court stressed the importance of a high and demanding standard of proof akin to that of selective prosecution.

> Similar caution is required in reviewing a claim of selective law enforcement. '[C]harges of racial discrimination…may be easy to make and difficult to prove.' *Marshall*, 345 F.3d at 1167. Executive-branch officials possess broad discretion in determining when to make a traffic stop or an arrest. *See id.* Judicial interference with law enforcement discretion might 'induce police officers to protect themselves against false accusations in ways that are counterproductive to fair and effective enforcement of the laws…'"

10

441 F.3d at 1264.  The court concluded that for similar reasons discovery should be limited, and concluded that some evidence of both discriminatory effect and discriminatory intent must be shown. *Id.*

In *United States v. Barlow*, 310 F.3d 1007 (7th Cir. 2002), the Seventh Circuit reached a similar conclusion.  *Id.* at 1010.   In *Barlow*, undercover DEA agents at Chicago's Union Station observed the defendant purchase two one-way tickets to Topeka, Kansas on Amtrak, one for himself and one for a friend, William Guidry, both of whom were African American. *Id.* at 108. The agents observed the defendant and Guidry each carrying a garment bag and continuously glancing over their shoulders at the agents, whispering to one another. *Id.*  With their suspicions raised, agents followed the two to the boarding area and approached, asking to speak with them. *Id*. at 1009.  The defendant and Guidry were briefly interviewed and gave consent for their bags to be searched. *Id.*  Agents recovered a package containing 485 grams of cocaine base and a loaded firearm from the defendant's bag and a loaded firearm from Guidry's bag. *Id*.

Upon subsequently being indicted for possession with intent to distribute cocaine base and carrying a firearm in relation to a drug trafficking crime, the defendant filed a motion for discovery on the grounds of selective enforcement. *Id*.  The defendant asserted he had been "pursued, stopped, interviewed, and investigated" by Drug Enforcement Administration agents based on his race. *Id.* As a result he requested the names and race of all individuals stopped by all agents and officers detailed to DEA Transportation Task Force for the period 1995-2000. The defendant further sought specific characteristics of the stops, including, but not limited to the date and time of the stops, length and reason for the stops, locations, outcomes, and name of all agents/officers involved. *Id*.

In support of his motion, the defendant submitted the affidavit of an expert witness on several racial profiling cases, who provided statistical data derived from a field study of law enforcement at Union Station. *Id.* The study focused on a 10-day period where surveillance was conducted to determine whether race played a role in law enforcement decisions to approach or stop travelers. *Id.* The investigators counted the total number of passengers who entered the departure gate for the same gate the defendant entered, and the subset of African Americans in that group. *Id.* They also recorded the race of those individuals from the total number of travelers who were approached by law enforcement. *Id.* One couple, other than the defendant and Guidry, were stopped. *Id.* They were also African American. *Id.*

The Seventh Circuit determined "Barlow complains not of selective prosecution, but of racial profiling, a selective law enforcement tactic. But the same analysis governs both claims: a defendant seeking discovery on a selective enforcement claim must meet the same 'ordinary equal protection standards' that *Armstrong* outlines for selective prosecution claims." *Id.* at 1010. The court stated that "[t]o prevail on his motion, therefore, Barlow needed to demonstrate that the agent's actions had a discriminatory effect and that the agents had a discriminatory purpose when they approached him in Union Station." *Id.*

To determine whether law enforcement's actions had a racially discriminatory effect, the court ruled, members of a protected racial group must illustrate they received less favorable treatment than nonmembers of the protected racial class. *Id.* Specifically, an African American claimant must demonstrate that a law or regulation was enforced against him, but not against a similarly situated individual of other races. *Id.* For Barlow to receive discovery on this claim, the court reasoned, "[he] was required to present evidence that DEA agents chose *not* to approach whites to whom he was similarly situated." *Id.*

The court further reasoned "[s]tatistical data has proven a useful tool in some high-profile state racial profiling cases." *Id.* at 1011. While statistics alone rarely establish an equal protection violation, they may be sufficient to establish the discriminatory effect prong in *Armstrong. Id. citing, Chavez*, 251 F.3d at 640. These statistics must be relevant and reliable, however. *Id.*

Lastly, the court found that the defendant did not demonstrate that DEA acted with a discriminatory purpose when approaching the defendant. *Id.* at 1012. The court determined that no racial comments were made during DEA's encounter with the defendant, and there was no evidence of a DEA policy, whether actual or *de facto*, encouraging racial profiling. *Id.* As a result of not being able to establish a discriminatory effect and purpose, the court denied the defendant's motion for discovery.

This Court should follow the decisions in *Barlow* and *Alcaraz-Arellano* in applying the *Armstrong* standard to the defendant's discovery request. The Court should therefore deny Defendant's motion because Defendant has failed to show some evidence of discriminatory effect or discriminatory intent.

Defendant asserts that some circuits have applied a lower threshold to discovery claims based on alleged selective enforcement. A lower threshold for discovery has been applied in cases involving selective enforcement claims concerning stash-house reverse-sting operations in the Third, Fourth, Seventh, and Ninth Circuits, and the Southern District of New York.[6] *See, e.g., United States v. Washington,* 869 F.3d 193, 220 (3rd Cir. 2017) ("motions for discovery seeking information on putative claims of unconstitutional selective enforcement are not governed by strict application of the *Armstrong/Bass*[7] framework."); *United States v. Davis*, 793 F.3d 712

---

[6] Defendant cites to Justice Gorsuch's concurring opinion in *Nieves v. Bartlett*, 139 S.Ct. 1715 (2019). That case dealt with whether probable cause defeated a First Amendment retaliatory arrest claim pursuant to 42 U.S.C. § 1983. Discovery pursuant to a selective enforcement claim was not at issue.
[7] *United States v. Bass*, 536 U.S. 862 (2002).

(7th Cir. 2015) (adopting a more permissive standard for discovery in stash-house reverse-sting operations and not addressing or overruling the holding in *Barlow*); *United States v. Sellers*, 906 F.3d 848 (9th Cir. 2018) (finding that requests for discovery on claims of selective enforcement in the stash-house reverse-sting operations context are governed by a less rigorous standard than that applied to claims of selective prosecution under *Armstrong*); *United States v. Hare*, 820 F.3d 93, 102 (4th Cir. 2016) (finding that even with the reduced standard and evidence sufficient to warrant discovery into selective enforcement, the defendants did not demonstrate they were entitled to discovery beyond what the government had provided); *United States v. Lopez,* 415 F.Supp.3d 422 (S.D.N.Y. 2019) (finding that a stash-house sting entails considerable government involvement including direct solicitation of the target and total control over the parameters; therefore, selective enforcement claims should be open to discovery on a lesser showing).

Even if the Court applies a less rigorous standard for discovery endorsed by *Washington*, the defendant has not made a sufficient showing for discovery beyond what the government has already provided.  In *Washington*, the court held that "a district court retains the discretion to conduct a limited pretrial inquiry into the challenged law-enforcement practice on a proffer that shows 'some evidence" of discriminatory effect…" 869 F.3d 193, 220–21.  Further, the proffer "must contain reliable statistical evidence" and "must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement."  *Id*.  The defendant has not provided reliable statistical evidence to support a finding of discriminatory effect and her proffer does not support a reasonable inference of discriminatory intent or non-enforcement of traffic infractions committed by white persons.

Furthermore, the facts of the instant matter are akin to *Alcaraz-Arellano* and *Barlow* and are not akin to a stash-house reverse-sting operation.  The dynamics inherent in the formulation

and implementation of stash-house reverse-sting operations are unique and not present in every day run-of-the-mill traffic stops.  Law enforcement is heavily involved in selecting and soliciting a target.  They control the quantity, location, and details of the "intended" robbery.  The court in *Sellers* set forth the specific elements inherently different in reverse-sting operations, stating that in such operations "no independent crime is committed; the existence of the 'crime' is entirely dependent on law enforcement approaching potential targets, and any comparative statistics can only be derived by the government and its informants choosing to approach and investigate white individuals." 906 F.3d 848, 853-854.  *See Hare*, 820 F.3d at 101 ("In the stash house sting context, a defendant would face considerable difficulty obtaining credible evidence of similarly situated individuals who were not investigated by ATF.").  The court further reasoned, "[i]n *Armstrong*, the Supreme Court concluded that requiring evidence about similarly situated defendants would not 'make a selective-prosecution claim impossible to prove.' That is not the case here; comparative statistics do not exist. As did the Court in *Armstrong*, we set the discovery standard accordingly and find that a lower standard is warranted under these circumstances." *Id.* at 854.

The court in *Lopez* similarly highlighted the difference between stash house stings and other contexts. 415 F.Supp.3d 422 at 425.  The court reasoned "a stash house sting entails considerable government involvement – including direct solicitation of the target and total control over the parameters of the robbery, particularly the quantity of cocaine held in the fictitious stash house – and appears highly susceptible to abuse." *Id.* (*citing Hare,* 820 F.3d 93, 103-04.)  "This 'potential for abuse and mischief that is endemic to fictitious stash-house stings' (i.e. reverse stings) necessarily includes a greater risk of 'racial profiling' and race-based enforcement." *Id.* at 25-26. (*citing Washington*, 869 F.3d 193, 223).

By comparison, traffic stops occur daily. There is no unilateral nation-wide policy containing targeting criteria and standards. While the Defendant paints the P.A.C.E. team as a large organization working in tandem with New England P.A.C.E. and other P.A.C.E. teams around the country. That is not so. Maine State Police P.A.C.E. team is their own unit belonging to the Maine State Police. Trooper Darcy is a member of that P.A.C.E. team. Conducting a traffic stop for a traffic infraction is at an officer's discretion. However, that discretion is drastically different than the discretion employed by ATF in a stash-house reverse sting. The court in *Sellers* emphasized that no comparative statistics existed in reverse-sting operations. 906 F.3d 848, 853-854. That is just not the case here. The distinction is great. In cases outside the stash-house reverse sting context, the required showing to justify discovery is more demanding, as evidenced by the decisions from the Seventh and Tenth Circuits. This case is no different and *Armstrong* should apply. Even if the Court were to apply the lower standard espoused in *Washington*, the defendant still has not met her burden.

### C.  The Showing To Obtain Discovery Must Include Evidence That Similarly Situated Persons Of Other Races Have Not Been Stopped And/Or Arrested

While the First Circuit has not directly addressed the issue of selective enforcement, it has addressed selective prosecution and the definition of "similarly situated" individuals in the context of selective prosecution.[8] "Although we have not previously provided a distinct definition of the term 'similarly situated' in the selective prosecution context, classic equal protection principles light our path and limn the attributes of one who is similarly situated." *United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008) (citing *Armstrong*, 517 U.S. at 465).  "A

---

[8] As discussed above, in selective enforcement cases other than stash-house reverse sting operations, the standard in *Armstrong* appears to be the guidepost in other Circuits. Therefore, logically, the analysis set forth by the First Circuit for "similarly situated" individuals in selective prosecution cases should be the same for selective enforcement cases.

similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced." *Lewis*, 517 F.3d at 27 (citing *Armstrong*, 517 U.S. at 469).  A district court "should assess every material fact in rendering its judgment as to which offenders should be deemed similarly situated." *Lewis*, 517 F.3d at 27; *see also United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996) (explaining that "defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them").

The defendant has not identified a single case in which a similarly situated individual of another race was not stopped for doing what she did.  Instead, the defendant cites to eight[9] stops that she claims support her contention that Trooper Darcy selectively enforced traffic laws against individuals of color.  All of the cases involve some individuals of color.  The defendant details a brief factual recitation in each case, but only supports some of her factual assertions with record support in two cases, *United States v. Gregory Martin*, 2:18-cr-00124-JDL, and *United States v. Terrel Walker*, 2:19-cr-00220-JDL.

In contrast to the defendant's factual assertions, two cases the defendant cites, *Martin* and *United States v. Fagan*, 2:19-cr-00123-DBH, had motions to suppress denied. Most recently in *Fagan*, Justice Hornby found Trooper Darcy's testimony credible and did not find that Trooper Darcy lied "in giving the unsafe lane change explanation" in stopping Fagan. 2:19-cr-123-DBH at p. 7.

---

[9] Defendant lists eight bullet points with case names in her motion, but in the preceding paragraph asserted that she identified at least ten stops. In footnote 1, defendant references eleven stops with another five she was unable to obtain sufficient detail about at the time of filing.  For the purpose of this motion, the government will rely on the eight stops for which defendant provided factual details in her motion.

The defendant cites *United States v. Brown*, 2:19-cr-207-GZS, as another traffic stop involving an individual of color effectuated by Trooper Darcy.  Brown was stopped for following the vehicle in front too closely on Interstate 95, as evidenced and captured on Trooper Darcy's watchguard video dated June 5, 2019.  Brown's vehicle applied its brake lights on three separate occasions before Trooper Darcy effectuated a stop.  The brake lights were observed on Trooper Darcy's watchguard on all three occasions.  Furthermore, Trooper Darcy informed the occupants upon being pulled over that their vehicle was following the one in front too closely.  A suppression hearing is pending and scheduled for August 30, 2021.

The defendant additionally cites to *United States v. Anthony Jones*, 2:19-cr-00201-JDL, and without record support asserts "Trooper Darcy deemed necessary to continue to detain them until a drug sniffing dog arrived." *Defendant's Motion for Discovery* p. 11.  In contrast to this factual assertion, on May 10, 2021, an agreed upon Prosecution Version was filed in *Jones* (ECF 78).  The Prosecution Version sets forth that a Trooper with the Maine State Police stopped a vehicle for an expired inspection sticker. Defendant was the driver. A female passenger was present in the front seat. An ensuing search of the vehicle resulted in the seizure of distributable quantities of suspected heroin from the trunk of the vehicle. Additionally, Defendant had a bag containing seventeen (17) grams of cocaine on his person in his pants. Laboratory tests confirmed the presence of heroin and cocaine in the seized substances. Defendant intended to distribute at least a portion of the seized substances to others.  *Jones* is currently pending sentence.

The Maine State Police Office of Professional Standards investigated Trooper Darcy's conduct in *United States v. Terrel Walker*.  The investigation included interviews and an examination of over one thousand traffic stops conducted by Trooper Darcy. As a result,

documents compiled and created by Maine State Police through the course of the investigation were provided to the United States Attorney's Office. These documents were not created at the United States Attorney's request.   As a result, the United States Attorney's Office provided some of these documents, with redactions, to the defendant.

These documents included summaries of information concerning Trooper Darcy's stops in 2019 and ten months in 2020. The government has provided counsel for the defendant with these summaries, including some other materials generated during the investigation. According to the summaries, Trooper Darcy conducted a total of 705 stops in 2019.  Of the 705 stops in 2019, 475 were of white individuals (67.38%), 86 were of Black individuals (12.2 %), 36 were of Hispanic individuals (5.11%), 22 were of Asian individuals (3.12%) and 86 were of individuals whose race was unknown (12.2%). Between January 2020 and October 2020, Trooper Darcy conducted 350 traffic stops. Of the 350 stops in 2020, 254 were of white individuals (72.57%), 28 were of Black individuals (8 %), 20 were of Hispanic individuals (5.71%), 10 were of Asian individuals (2.86%) and 38 were of individuals whose race was unknown (10.86%).

Additionally, the government provided two documents, each providing summaries created by Maine State Police, listing the details of the five vehicle stops conducted by Trooper Darcy before and after traffic stops that yielded drug seizures conducted by Trooper Darcy in 2020.  One summary provides the ten stops surrounding drug seizure stops that were sent to the State of Maine for anticipated prosecution.  A second summary details the ten stops surrounding a traffic stop that resulted in a drug seizure that was sent to the United States Attorney's Office for anticipated prosecution.  These documents set forth the date, ethnicity of occupant involved,

reason for the stop, and result of the stop.  They also provide the vehicle registration and state of registration, as well as the state affiliated with the driver's license.

The eight cases provided by the defendant do not prove that similarly-situated individuals of *another* race could have been, but were not stopped or arrested in similar circumstances.  Even if a lower standard of proof for discovery was applied, the defendant's eight cases—two from 2018 and five from 2019— do not warrant the broad discovery defendant seeks.  Defendant's showing is clearly insufficient, particularly in light of the discovery already voluntarily provided by the government, which contains information of similarly situated individuals to the defendant of another race.

The defendant's attempt to bolster her showing with statistical data also fails.  She provides a statistical analysis that she compiled herself derived from the Maine State Police Instagram account.  First, there is no evidence to suggest that certain cases highlighted on the Maine State Police Instagram account are representative of the totality of the traffic stops the Maine State Police made during a given period.  Trooper Darcy alone, as evidenced by the summary of stops he conducted in 2019 and ten months of 2020, conducted 1055 stops in 22 months.  The number of total stops conducted by Maine State Police, as a whole, will be undoubtably much larger than that.

Second, defendant's comparison of the numbers derived from the Maine State Police Instagram page to the population of the State of Maine fails to show that Trooper Darcy and the P.A.C.E. team were disproportionally selecting individuals of color for traffic stops. Defendant's assertion that "[i]t is safe to conclude that the driving public is a reflection of the public at large, and thus that the overwhelming number of drivers, and by extension people who commit traffic infractions on Maine roads are also white," *Defendant's Motion for Discovery*

p.23, does not account for the geographic location in which the P.A.C.E. team operates.  Trooper Darcy and the P.A.C.E. team are positioned in York County, the county that lies on the border between Maine and New Hampshire.  Further, Interstate 95, runs through York County, serving as an ingress and egress for Maine travelers coming from throughout the East Coast.  Without better information about who is travelling through York County on I-95 at any given time of year, the defendant's statistical analysis is pure speculation and is similar to that speculation rejected in *Barlow*.

While the defendant here did not conduct an independent field study, she did offer eight cases of stops involving individuals of color and Trooper Darcy.  Additionally, she compiled statistics from various databases and social media platforms to come up with a statistical conclusion regarding Trooper Darcy.  In *Barlow*, the court determined "[e]ven if we accept Dr. Lamberth's conclusions as statistically valid, however, Barlow has still presented no evidence that he received less favorable treatment than similarly situated white travelers."  310 F.3d at 1012.  That same failure is present here.   Defendant's broad request for discovery should be denied.

As a result, the defendant has utterly failed to meet the burden established in *Armstrong* or any lower standard she claims applies to show that individuals of other races could have been stopped and/or arrested but were not.   Further, the government has, in fact, voluntarily provided over a years' worth of data regarding stops conducted by Trooper Darcy that the defendant has had an opportunity to review.  This evidence establishes that Trooper Darcy was, in fact, not improperly stopping people on the basis of their race.  The defendant has not made a sufficient showing for discovery in relation to Trooper Darcy or the Maine State Police P.A.C.E. team.  As a result, the defendant's motion for discovery should be denied.

21

**CONCLUSION**

The government respectfully requests that the Defendant's Motion for Discovery be

denied.


Dated: August 6, 2021

                                        Donald E. Clark
                                        Acting United States Attorney


                                         /s/ Meghan E. Connelly
                                        Meghan E. Connelly
                                        Assistant United States Attorney
                                        U.S. Attorney's Office
                                        100 Middle Street Plaza, East Tower
                                        Portland, ME  04101
                                        (207) 780-3257
                                        Meghan.connelly@usdoj.gov

**UNITED STATES DISTRICT COURT
DISTRICT OF MAINE**

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2021, I electronically filed the Government's Opposition to the Defendant's Motion for Discovery with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the counsel of record.

Donald E. Clark
Acting United States Attorney

/s/ Meghan E. Connelly
Meghan E. Connelly
Assistant United States Attorney
U.S. Attorney's Office
100 Middle Street Plaza, East Tower
Portland, ME  04101
(207) 780-3257
Meghan.connelly@usdoj.gov