# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Docket No. 2:19-cr-00175-NT |
| | ) |
| ALEXIS BOYD, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

Defendant Alexis Boyd is charged with possession of fentanyl and heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Before me is the Defendant's motion to suppress all evidence seized by police officers during a traffic stop. Def.'s Mot. to Suppress Evid. ("**Def.'s Mot.**") (ECF No. 42). I held a hearing on the Defendant's motion on October 27, 2021 (ECF No. 76). For the reasons set forth below, I **GRANT** the Defendant's motion to suppress.

## BACKGROUND

On June 26, 2019, Maine State Trooper John Darcy ("**Darcy**")[1] stopped a Kia Sedona minivan with Maine plates (the "minivan") while it was traveling northbound on the Maine Turnpike in York. Darcy's cruiser cam video, which recorded the one minute of driving that preceded the traffic stop, shows the minivan driving in the far-right lane of the three northbound lanes. Darcy's police cruiser is positioned in the middle lane behind the minivan, approximately two-to-three car lengths back until

---

[1] John Darcy was a Maine State Trooper when he conducted the traffic stop in June of 2019. He has since become a corporal. To avoid confusion, I refer to him simply as "Darcy" in this order.

he activates his blue lights and pulls the minivan over. In the video, the minivan appears to be traveling at a steady speed, and no other northbound vehicles overtake the car. The driver of the minivan clearly favors the right side of his lane, but at no time does the minivan swerve or drift within its lane. While the video shows the minivan's right tires very close to the fog line[2] and possibly touching the line a couple of times, it is not clear that the tires actually contact the fog line.[3] It is clear, however, that the vehicle never crosses over the fog line.

Approximately one minute into the video, Darcy activates his blue lights, and the minivan immediately (and for the first time) crosses the fog line and pulls over into the breakdown lane, where it stops.[4] After making the stop, Darcy approaches the passenger window of the minivan and addresses the two occupants—driver Donald Green and passenger Alexis Boyd, the Defendant. Both Green and Boyd are Black, and Green is wearing his hair in dreadlocks. Darcy informs Green that he was stopped because "two times, almost three times" Green was "swerving into the right

---

[2]   "The term 'fog line' generally refers to the white line on the right-hand side of a road that separates the driving lane from the shoulder." *United States v. Lawrence*, 675 F. App'x 1, n.1 (1st Cir. 2017) (quoting *United States v. Diaz*, 802 F.3d 234, 238 n.8 (2d Cir. 2015)).

[3]   Because Darcy's cruiser is not in the same lane as the minivan, the cruiser cam records the car at an angle, making it difficult to discern exactly where the minivan's right tires are in relation to the far-side fog line. Darcy presumably had the same view from his vantage point in the driver's seat of the cruiser.

[4]   Darcy wrote up the traffic stop in a Maine State Police Continuation Report. According to Darcy's police report, Darcy "was traveling northbound on the Maine turnpike in York," and he saw the minivan traveling ahead of him in the right-hand lane. The report states that Darcy "observed the vehicle cross the fog line into the breakdown lane on three separate occasions" and that he "stopped the vehicle for failing to maintain its lane."

2

lane" and "going like 45" miles per hour.[5] Darcy asks whether Green was falling asleep or drinking or texting or "anything like that." From what I can tell,[6] Green says no. Darcy later wrote in his report and testified at the suppression hearing that he did not see any signs that Green was fatigued or impaired. Darcy then questions whether Green might have been "messing around with the GPS or something." Green responds affirmatively, and Darcy advises Green to try to have his passenger operate the GPS so Green can focus on the road because, Darcy says, "a couple times it looked like you were going to go off into the ditch or something."

Darcy requests identification from both occupants, which they produce, and Darcy questions Green as to why his driver's license shows that he is from Connecticut but he is driving a Maine-registered vehicle. Darcy tells Green that he cannot hear and has him step out of the car. Green gets out of the minivan, and Darcy tells Boyd to stay in the car to continue looking for the vehicle's registration. Once out of the minivan, Green consents to a pat-down, and Darcy confirms that Green is unarmed.

Darcy resumes his questioning of Green near the front of the cruiser. Green explains that he lived in Maine with his cousins for two months and that he was returning to Maine for a funeral because his aunt died. Green also says that he runs a foundation supporting children in public schools and that Boyd is an artist with the

---

[5] The speed limit on the Maine Turnpike in the vicinity of the stop was a maximum of seventy miles per hour and a minimum of forty-five miles per hour.

[6] The audio in the cruiser cam footage is sometimes difficult to make out due to the road noise of passing traffic and the loud music that was left playing in Darcy's cruiser during the stop.

3

foundation. Green says he cannot remember the name of the town in Maine where he previously lived, but he recalls the address, which he has in the GPS, being something like Bolling Drive. Green tells Darcy that he and Boyd will probably be in Maine until Friday (the traffic stop occurred on a Wednesday night).

Darcy then goes back to the passenger window of the minivan and speaks to Boyd. He asks her their destination, and she supplies Bangor as the missing town name. When Darcy asks Boyd why she is going to Bangor, Boyd says that she is going to visit her aunt who is sick with cancer. Darcy asks Boyd about her relationship to Green, and she says that they are cousins. In response to Darcy's question about the length of her stay, Boyd tells Darcy that they plan to stay in Bangor for a few days.

Leaving Boyd in the minivan and Green outside, Darcy returns to his cruiser and immediately calls for Trooper Jodell Wilkinson to bring her drug-sniffing dog to the scene.[7] After he requests the assistance of the female trooper and her dog, Darcy runs the information from Green's and Boyd's licenses through the Maine Bureau of Motor Vehicles ("**BMV**") database and learns that Green's license is suspended. Darcy did not find any issues with Boyd's license.

When Trooper Wilkinson arrives,[8] she has her dog conduct a sniff of the vehicle. The dog alerts to the presence of narcotics at the front of the minivan. Darcy and Wilkinson then search both Green and Boyd, as well as the inside of the vehicle.

---

[7] Darcy testified at the suppression hearing that based on "huge differences" in the pair's statements about their destination and their relationship, he believed there was criminal activity taking place because, in his view, "there was no other reason for those large discrepancies."

[8] A third trooper also responds to the scene to assist.

4

Inside Boyd's backpack, in the trunk area of the minivan, Darcy finds fifty-two grams of a substance that preliminarily tested as heroin. Green and Boyd are then handcuffed and taken into custody, and Boyd is later charged with possession with intent to distribute.

## DISCUSSION

Boyd, the Defendant, has moved to suppress all evidence seized during the traffic stop. *See United States v. Sowers*, 136 F.3d 24, 27 (1st Cir. 1998) (holding that a passenger may challenge the detention resulting from a traffic stop). She argues that the investigatory stop violated her Fourth Amendment rights because the stop was not supported by reasonable articulable suspicion that a traffic violation had occurred. She also maintains that Darcy's prolonged investigation exceeded the constitutionally permissible scope of the traffic stop.

### I. Legal Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). Therefore, "that detention must be reasonable in order to pass constitutional muster." *United States v. Ruidíaz*, 529 F.3d 25, 28 (1st Cir. 2008) (citing *Terry v. Ohio,* 392 U.S. 1, 19 (1968); *United States v. Chhien*, 266 F.3d 1, 5–6 (1st Cir. 2001)). There are two parts to this reasonableness

requirement in the investigatory traffic stop context. "First, a police officer must have a reasonable, articulable suspicion of an individual's involvement in some criminal activity in order to make the initial stop." *Ruidíaz*, 529 F.3d at 28 (citing *Terry,* 392 U.S. at 21; *Chhien,* 266 F.3d at 6). "Second, actions undertaken pursuant to that stop must be reasonably related in scope to the stop itself 'unless the police have a basis for expanding their investigation.' " *Id.* at 28–29 (citing *United States v. Henderson,* 463 F.3d 27, 45 (1st Cir. 2006)).

The initial "traffic stop is constitutional if an officer has a reasonable suspicion of unlawful conduct involving a motor vehicle or its operation." *United States v. Jenkins*, 680 F.3d 101, 104 (1st Cir. 2012) (citing *Chhien*, 266 F.3d at 5–6). Reasonable suspicion "requires more than a naked hunch that a particular person may be engaged in some illicit activity." *Chhien,* 266 F.3d at 6. To satisfy the reasonable suspicion standard, a police officer " 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts,' justify an intrusion on a private person." *United States v. Jones*, 700 F.3d 615, 621 (1st Cir. 2012) (quoting *Terry*, 392 U.S. at 21). Reasonableness "must be judged according to objective criteria"—not "an individual officer's subjective motives." *Ruidíaz*, 529 F.3d at 29. "Because reasonable suspicion requires a particularized and objective basis for suspecting an individual of criminal activity, courts 'view the circumstances through the lens of a reasonable police officer,' looking to the totality of the circumstances to determine whether reasonable suspicion existed." *United States v. McDonald*, 804 F.3d 497, 502 (1st Cir. 2015) (quoting *United States v.*

*Dapolito*, 713 F.3d 141, 148 (1st Cir. 2013)). The government bears the burden of showing such a particularized and objective basis for suspecting criminal activity. *United States v. Monteiro*, 447 F.3d 39, 43 (1st Cir. 2006). In reviewing a traffic stop, the court must "look to the facts 'available to the officer at the moment of the seizure or the search.' " *Jones*, 700 F.3d at 621 (quoting *Terry*, 392 U.S. at 22). "This inquiry is fact-sensitive, and the requisite objective analysis must be performed in real-world terms." *Ruidíaz,* 529 F.3d at 29. Put another way, "the court must make a practical, commonsense judgment based on the idiosyncracies of the case at hand." *Jones*, 700 F.3d at 621 (quoting *Chhien,* 266 F.3d at 6).

## II. The Initial Traffic Stop

The Government maintains that Darcy's traffic stop was supported by "reasonable articulable suspicion that Green either was impaired or committed a traffic violation when he repeatedly made contact with the fog line over a short period of time." Gov't's Obj. to Def,'s Mots. [sic] to Suppress Evid. ("**Gov't's Opp'n**") 5 (ECF No. 59). The Government contends that three circumstances justified the stop: "(1) the late hour of the stop; (2) Green contacting the fog line three times in under one minute; and (3) Green barely maintaining the minimum speed of 45 miles-per-hour." Gov't's Opp'n 6. The Government also notes that the stop was properly motivated by a public safety concern based on "Green's repeated contact with the fog line and his slow speed." Gov't's Opp'n 6 n.2. For the reasons that follow, the Government's argument fails both on the facts and the law.

### A.  The Factual Basis for the Stop

I begin with the issue of whether the "late hour" provided grounds to support the stop, and I dismiss it out of hand. It seems excessive to call 10:24 pm a particularly suspicious time. In the first three minutes of the video, fifty vehicles are seen traveling on the highway. While I am familiar with the expression, "nothing good happens after midnight," a lot of people are still out and going about legitimate business at 10:30 pm. I do not believe that the fact that it was 10:24 pm adds much, if anything, to the basis for the stop.

As to the issue of the lane violation, Darcy has offered inconsistent versions of what happened. Darcy—who was the only witness at the evidentiary hearing—testified that he observed Green's minivan go "onto and over the fog line on three separate occasions" within the one minute of travel recorded by his cruiser camera. He wrote in his report that he saw the minivan "cross the fog line into the breakdown lane on three separate occasions." And in the exchange captured on video, when Darcy was informing Green and Boyd of the reason for the stop, he said Green was "swerving into the right lane" "two times, almost three times." Darcy also told Green that "a couple times" it looked like Green was "going to go off into the ditch or something."

The cruiser cam video enables me "to observe exactly what Trooper Darcy observed when he made the decision to execute the challenged traffic stop."[9] Gov't's Opp'n 7. The cruiser cam video squarely refutes Darcy's versions of the events that

---

[9]  The Government conceded that nothing that the vehicle did before the cruiser cam video starts would have supported a stop.

8

night. Not once did Green's minivan "swerve" as Darcy claimed it did.[10] Not once did Green's minivan look like it was going to go into a ditch. Not once—let alone on three separate occasions—did Green's minivan cross the fog line and go into the breakdown lane. Yet, even with video evidence to the contrary, Darcy claimed under oath that he observed Green's car go "onto and over the fog line" on three different occasions within the one-minute timeframe captured by the cruiser cam.

As to the issue of speed, the only evidence of the speed that Green was traveling was the statement Darcy made to Green when he pulled him over that he was "going like 45" and Darcy's testimony at the hearing that, prior to stopping Green's vehicle, he observed it "traveling approximately 45 miles per hour." The minimum speed limit on the highway is forty-five miles per hour, so even if Green were traveling forty-five miles per hour, that would not provide the reasonable articulable suspicion necessary to pull the minivan over.

There are, however, reasons to doubt Darcy's testimony that Green was "traveling approximately 45 miles per hour." First, as noted above, Darcy exaggerated the minivan's movements to Green; the minivan never swerved into the right lane or seemed headed for the ditch. This gives me reason to believe that Darcy was also exaggerating the slowness of the vehicle. Second, Darcy did not mention the minivan's speed in his report, which I find an odd omission if it were really part of the basis for his stop. Third, Darcy did not testify at trial about how he estimated the

---

[10] The Government conceded at the hearing that Green did not swerve into the breakdown lane. Counsel for the Government tried to explain that "[t]he word swerve was inaccurate, inartful." I find that Darcy's statement that Green was swerving out of his lane was more than inartful; it was untrue.

9

minivan's speed. There is no indication that Darcy used radar equipment, and Darcy did not testify that he determined Green's speed by keeping pace with the minivan and noting the speed of travel. *See United States v. Ruiz,* 832 F. Supp. 2d 903, 916 (M.D. Tenn. 2011) (noting that whether vehicle was speeding would not be in dispute if officers had "simply used the technology at their disposal to create documentary evidence" of the defendant's speed). I cannot tell from the video the exact speed of the minivan during the one minute preceding the stop, but it would have been possible to ascertain the exact speed of the vehicle using the video if the Government had wanted to do so.[11]

Further undercutting Darcy's credibility as to the speed of the vehicle and the basis for the stop was the evidence about when (and why) Darcy began following Green. When Darcy initiated the stop at 10:24 pm, Green's minivan was at Mile 13.5 of the Maine Turnpike headed northbound. But Darcy conducted an earlier BMV query of Green's car at 10:18, approximately six minutes before the stop. This means that Darcy started following Green's car at least six minutes before he pulled it over. The Government has conceded that no traffic violation occurred before the cruiser camera started recording (five minutes after Green's car was called in). The timing here begs the question, unanswered by Darcy, of why he called in the license plate and where he was when he called it in.

---

[11] It takes the vehicle about forty seconds to travel from Mile 13 to Mile 13.5, where it is pulled over, which equals an average speed of forty-five miles per hour. But that average includes the time it takes Green to slow down and come to a complete stop, so he likely was driving faster than forty-five miles per hour prior to that. It would have been fairly simple to ascertain the exact speed of travel earlier in the video by taking some measurements and performing a simple math equation, but the Government did not introduce any such evidence.

10

The defense elicited that, in June of 2019, the York toll plaza was located around Mile 7[12] of the Maine Turnpike—a little over six miles from where Darcy stopped Green's minivan. At the hearing, Darcy was asked whether he first observed Green and Boyd as they were traveling northbound through the York toll plaza, and Darcy testified that he did not know where he initially saw them.[13] Darcy conceded on cross-examination that he sometimes would position his cruiser at the York toll plaza so that he could observe the occupants in the cars as they slowed down and came through those tolls.[14] And he admitted that he would look for things that might catch his eye and that he would follow the cars if he had a "gut feeling" that some criminal behavior might be afoot. This is consistent with statements that Darcy made to a fellow trooper in 2019.[15] In this conversation, Darcy indicated that when his suspicions were aroused, he would sometimes run a car's registration before he saw a driver commit any infraction. And he also said that he follows cars if he sees a guy

---

[12]     Defense counsel asked Darcy if the York Toll Plaza was at Mile 7.3 in 2019 and he responded, "I believe it was around 7, yes."

[13]     In his report, Darcy writes: "I was traveling northbound on the Maine turnpike in York. I observed ME PC 6032WV [the minivan's license plate] traveling ahead of me." The implication from the report is that both vehicles were traveling northbound and that Darcy had not seen Green before the stop.

[14]     Darcy indicated that at the time of the stop, he was a Maine State Police Trooper who was assigned to Troop G, which patrolled the Maine Turnpike from Kittery to Augusta, Maine.

[15]     The 2019 conversation was recorded, and it was used as evidence in a suppression hearing in *United States v. Fagan*, No. 2:19-cr-123-DBH, 2021 WL 3262139, at *1 n.1 (D. Me. Jul. 29, 2021). In April of 2021, Darcy was interviewed about this 2019 conversation during a Maine State Police internal investigation into complaints that Darcy was engaged in racial profiling. Defense counsel introduced a redacted transcript of this internal investigation interview with Darcy as Defendant's Hearing Exhibit 1.

11

"wearing a wife-beater,[16] he's got dreads, he looks like a thug." *United States v. Fagan*, No. 2:19-cr-123-DBH, 2021 WL 3262139, at *1 n.1 (D. Me. Jul. 29, 2021).

Based on Darcy's testimony and the facts about when Darcy called in Green's license plate and where the minivan was pulled over, an inference can be drawn that Darcy first saw the minivan carrying Green and Boyd at the York toll plaza a little over six miles south of where he made the traffic stop. And a further inference can be drawn that Green was traveling closer to sixty miles per hour as he headed north toward Bangor.[17] These reasonable inferences further undermine Darcy's claim that he pulled the vehicle over in part because it was traveling forty-five miles per hour.[18]

Finally, I address the Government's footnoted claim that the stop was justified because the vehicle was being operated in an unsafe fashion. There was no other northbound traffic on the Turnpike seen on the video before the stop. Even assuming that Green touched the inside of the fog line on three occasions and accepting that Green stayed to the right side of the far-right lane, he was not weaving or swerving in the lane, and he was maintaining a steady speed. Furthermore, Green's position

---

[16] The term "wife-beater" in this context refers to an "undershirt[ ] with thin straps or no sleeves, as in a 'tank' undershirt." *See, e.g., Mota v. Warden, Lebanon Corr. Facility*, No. 1:09-cv-233, 2010 WL 1727867, at *4 (S.D. Ohio Mar. 30, 2010), *report and recommendation adopted,* No. 1:09-cv-233, 2010 WL 1727883 (S.D. Ohio Apr. 27, 2010).

[17] A vehicle traveling an average of sixty-two miles per hour would travel 6.2 miles in six minutes.

[18] They may also explain Darcy's actual motivation for pulling Green over, but a police officer's subjective motivations for a stop are not relevant in a Fourth Amendment analysis. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *United States v. Favreau*, 886 F.3d 27, 30 (1st Cir. 2018) (noting that police officers' "ulterior motive is of no consequence under the Fourth Amendment"). I use these inferences solely to assess the credibility of Darcy's account. *See Ornelas v. United States,* 517 U.S. 690, 700 (1996) (part of Fourth Amendment analysis is determining whether the police officer is credible).

to the right side of the far-right lane and his lower speed were likely a product of the fact that Darcy had been following him for at least six minutes. Many drivers would move right and slow down if a marked police cruiser were hovering just behind them. I do not credit Darcy's claim that Green's operation of the vehicle suggested impairment or distraction, in part because Darcy was generally not a very credible witness and in part because the video tells a different story. There is nothing on the video that I would consider unsafe operation.

### B. The Asserted Legal Authority for the Stop

Even assuming that Green's vehicle did in fact contact the fog line, it is not clear to me that touching the fog line is a violation of Maine's traffic laws. Under Maine law, "[a] vehicle must be operated as nearly as practical entirely within a single lane." 29-A M.R.S. § 2051(1). Section 2051(1) does not specify whether merely touching a lane-marking line constitutes a violation of a driver's obligation to operate the vehicle "as nearly as practical entirely with a single lane." Nor does the statute define where the lane begins and ends. It could be at the inner edge of the fog line, the outer edge of the fog line, or somewhere in between. That makes the law ambiguous as to what counts as "out of bounds" for traffic violation purposes.

The Law Court has held that whether a vehicle has violated that Maine statute is a fact-specific inquiry, and "[t]here is no precise number of line touchings or crossings by a vehicle operator that delineates a constitutionally justified stop from an unjustified one." *State v. Laforge*, 2012 ME 65, ¶ 10, 43 A.3d 961 . Indeed, the Law Court has also held that a driver's "brief, one-time straddling of the center line of an undivided highway"—a movement substantially more dangerous than Green's—did

13

not support the officer's subjective suspicion that the defendant was either intoxicated or asleep. *See State v. Caron*, 534 A.2d 978, 979 (Me. 1987). And the cases where the Law Court has held that a stop was justified based on a lane violation have involved additional intelligence or considerably more egregious facts than here. *See Laforge*, 2012 ME 65, ¶ 13, 43 A.3d 961 (traffic stop warranted where officer saw defendant drive onto the center line twice, then cross the fog line twice with his passenger-side tires, and then cross the center line with his driver-side tires twice more); *State v. Porter*, 1008 ME 175, ¶¶ 2, 12, 960 A.2d 321 (traffic stop permissible where the defendant drove onto the fog line, then crossed over the center line by a foot, and then drove onto the center and fog lines again, within a quarter-mile); *State v. Lafond*, 2002 ME 124, ¶¶ 2, 4, 13 , 802 A.2d 425 (investigatory traffic stop warranted where a police officer had received a specific anonymous tip of a possibly intoxicated driver and the officer saw the defendant's vehicle swerving and crossing the fog line); *State v. Brown*, 675 A.2d 504, 505 (Me. 1996) (traffic stop satisfied reasonable and articulable suspicion standard where the officer saw the vehicle abruptly cross over the center line and then jerk to the right and strike the fog line while varying its speed, twice going as low as ten mph before speeding up); *State v. Pelletier*, 541 A.2d 1296, 1296–97 (Me. 1988) (traffic stop supported where the officer followed the vehicle for four to five miles and observed the vehicle cross the center line three times and drift onto the shoulder once); *cf. United States v. Beauregard*, No. 2:18-cr-00192-JAW, 2019 WL 2619530, at *5, 7 (D. Me. June 26, 2019) (traffic stop authorized where DEA agent had conducted prior surveillance of the car and

14

alerted police that its operator was suspected of drug trafficking, and the officer observed the car follow too closely behind another vehicle and weave three times, twice with the left tire over the lane markers); *United States v. O'Connell*, No. 2:19-cr-00017-GZS, 2019 WL 2396560, at *1, 3 (D. Me. June 6, 2019) (traffic stop supported where the officer followed the truck for a few miles after receiving a drug trafficking tip from Maine DEA, and the officer saw the truck remain in the middle lane without actively passing other vehicles and saw it cross the lane dividers at least once and jerk side-to-side within the lane multiple times).

Two opinions from other federal district courts interpreting similar state traffic lane laws are persuasive. In *United States v. Sugar*, 322 F. Supp. 2d 85 (D. Mass. 2004), a sheriff's department officer was patrolling a stretch of highway in Missouri, known to be a drug pipeline route, when he saw a recreational vehicle ("**RV**") with Vermont plates. *Id.* at 88–89. There were two lanes and a shoulder on the side of the divided highway where the RV was traveling, and the RV was driving in the right lane. *Id.* at 89. The officer trailed the RV in the passing lane for a half-mile, looking for a traffic violation that would provide grounds for a stop because the officer wanted to search the vehicle for drugs. *Id.* The officer "finally saw the right rear tire go completely over the 'fog line' " and pulled over the RV. *Id.* A subsequent dog sniff and search of the vehicle revealed that the RV was carrying drugs. *Id.* at 90. In the criminal matter brought against the RV's occupants in the federal district court in Massachusetts, the court granted the defendants' motion to suppress the drug evidence. *Id.* at 88. At the evidentiary hearing, the officer testified that he had

15

probable cause to stop the RV because he saw its rear tires cross over the fog line and into the right shoulder three times. *Id.* at 91. Missouri has a traffic statute that is similar to Maine's and requires that a vehicle "be driven as nearly as practicable entirely within a single lane." *Id.* (quoting Mo. Rev. Stat. § 304.015.5). The court found it "highly unlikely" that the RV's "wheels went substantially onto the shoulder three times" while the marked cruiser was following it and the driver was aware of the officer's presence and attempting to comply with traffic laws. *Id.* at 92. And the court held that a one-time crossing of the fog line (which the court found had occurred) did not violate the Missouri statute because "the phrase 'as nearly as practicable' indicates that the statute was not intended to comprehend minor swerving." *Id.* at 91. Therefore, the officer's stop of the RV was not reasonable or justified by probable cause under the state traffic law and the drug evidence was "suppressed as the fruit of the poisonous tree." *Id.* at 92.

And in *United States v. Williams*, No. 5:13-cr-50, 2014 WL 412526 (D. Vt. Feb. 3, 2014), the federal district court analyzed in the suppression context an asserted violation of a statute that is nearly identical to Maine's Section 2051(1). In *Williams*, the trooper saw the defendant's vehicle "coming close to the dotted center line" and then soon after "cross the passing lane demarcation." *Id.* at *1 (internal quotation marks omitted). Based on this, the trooper initiated the traffic stop that ultimately led to evidence of drug distribution. In its review, the court noted that "[t]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *Id.* at *5 (quoting *United States v. Santos,* 553 U.S. 507, 514

16

(2008) (plurality opinion)). This "venerable rule" serves to "vindicate[ ] the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed." *Id.* (quoting *Santos,* 553 U.S. at 514). After reviewing state court opinions, the federal district court concluded that, under Vermont's lane-maintaining law, "momentarily touching a passing lane demarcation with no risk to public safety does not give rise to a failure to 'remain entirely' in a single lane 'as nearly as practicable.' " *Id.* at *5–7. Therefore, the state trooper's stop was unlawful, and the defendant's seizure violated the Fourth Amendment. *Id.* at *7.

Here, I conclude that Green's three *de minimis* contacts with the inner edge of the fog line (if they occurred at all), with no other indicators of impaired driving or danger to public safety, do not constitute a violation of Maine's traffic laws sufficient to justify the stop. Viewing the totality of the circumstances through the lens of a reasonable police officer, there was no basis, in fact or in law, to suspect Green of a traffic violation. Because the Government fails to meet its burden of showing a particularized and objective basis for stopping Green's car, I find that Darcy's initial stop was not justified by reasonable articulable suspicion and therefore violates the Fourth Amendment.

### III.   The Subsequent Investigation

Because I conclude that the initial stop was unconstitutional, I do not reach the Defendant's second argument that Darcy further violated Boyd's Fourth Amendment rights by extending the detention beyond the time necessary to address the traffic violation underlying the stop.

## CONCLUSION

For the reasons stated above, I **GRANT** the Defendant's motion to suppress.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 15th day of November, 2021.